Filed 3/24/15  P. v. Tiscareno CA2/6
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br> Plaintiff and Respondent,<br><br>v.<br><br>RAUL TISCARENO and DANIEL KEITH MARTINEZ,<br><br> Defendant and Appellant. | 2d Crim. No. B250637<br>(Super. Ct. No. NA081091)<br>(Los Angeles County) |

In their consolidated appeals, Raul Tiscareno and Daniel Keith Martinez appeal their convictions, following their joint jury trial, of the robbery (Pen. Code, § 211)[1] and first degree felony murder with robbery special circumstances (§§ 187, 190.2, subd. (a)(17)), of Ginie Samayoa.  The jury further found that appellant Martinez possessed a firearm after having previously been convicted of a felony. (§ 29800, subd. (a), former § 12021, subd. (a).)  It found not true the sentence enhancement allegation that Martinez personally used a firearm in committing either the robbery or the murder.  Both appellants were sentenced to life in prison without the possibility of parole.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

1

Appellant Tiscareno contends the judgment against him is not supported by substantial evidence. Appellant Martinez contends the jury's special circumstance finding against him is not supported by substantial evidence. Both appellants contend the trial court erred in its instructions to the jury concerning aiding and abetting and that it erred when it failed to instruct the jury, sua sponte, that the special circumstance of murder during the commission of a robbery is not established if the robbery was merely incidental to the murder. We affirm.

*Facts*

The victim, Ginie Samayoa supported herself by committing identity theft using a laptop computer equipped with a program that could generate credit card numbers. She became acquainted with Michael "Ghost" Bonfiglio and his girlfriend, Monic Barnett because they purchased dogs from the same litter. Samayoa lived in a studio apartment in San Pedro while Bonfiglio and Barnett lived in Whittier. Barnett occasionally dog sat for Samayoa, who paid her with fraudulent gift cards. She also sold the couple other fraudulent cards at a steep discount. Bonfiglio had recently been released from prison and was unemployed. Eventually, he asked Samayoa to give him a computer with the same card-creating program. Samayoa told her friend Arlene Cachu that she wasn't going to give Bonfiglio the computer.

Samayoa's upstairs neighbor and friend, John Ramsden, sold her the laptop she used to create the gift and credit cards. On January 29, 2009, Ramsden heard a loud banging sound from below his apartment. After walking outside and half-way down the staircase, Ramdsen saw two Hispanic men banging on Samayoa's apartment door. Ramsden had never seen the men before. One of the men turned to Ramsden and said, "Tell Ginie that Ghost was looking for her."

Ramsden allowed Samayoa to use his router for internet access. On the morning of January 30, 2009, Ramsden received a Facebook message from Samayoa asking him to reboot the router because she was not able to connect to the internet. He did so and then went down to her apartment, to make sure the problem had been

2

corrected.  Samayoa was at home, with three White or Hispanic men in her apartment. She seemed calm and gave no indication of being afraid of the men.  Ramsden left in time to attend an 8:00 a.m. Alcoholics Anonymous meeting.  He could not identify any of the men in the room, or say whether they were the same men he had seen the day before.

Heidi Schmid and Michaela Ingram shared an apartment on the same floor of the building as Samayoa.  On the morning of January 30, they planned to meet at their regular 8:00 a.m. Alcoholics Anonymous meeting.  Ingram took her children to school between 7:30 and 7:40 a.m.   As they were leaving, she saw Samayoa coming down the stairs with three men.  One man was walking behind Samayoa; the other two were walking behind him.  Everyone seemed fine, although Ingram thought the situation seemed suspicious.  Samayoa and the three men went into her apartment.

Schmid walked down the hallway at about 7:45 a.m.  As she did, she passed Samayoa, her dog and three men leaving her apartment.  Samayoa seemed fine, but at least one of the men seemed angry.  Schmid said "good morning" as she passed the group; Samayoa replied, "Hi, how are you?"  The men said nothing.

Schmid walked down the alleyway behind their apartment building, looking for Ingram.  When she realized Ingram had already left for their meeting, Schmid walked back up the alley to the apartment building.  As she was walking, Schmid saw Samayoa get into her Toyota Tercel with the three men and her dog. Appellants were in the back seat and Bonfiglio was in the front, passenger seat.

At about 8:00 a.m., Los Angeles police and emergency medical personnel responded to a call regarding a person shot in the alleyway near 38th Street. They found Samayoa slumped in the driver's seat, with blood dripping from her nose. Samayoa's dog was in the back seat of the car.  The car's engine was still running. Attempts to revive Samayoa failed.  She died from a single gunshot to the right rear of her head.

3

Samayoa's cell phone was recovered from the car. It contained contact information for both Bonfiglio and Barnett. The phone's log indicated that, on the morning of January 30, Samayoa received 18 calls from Monic Barnett's cell phone.

Samayoa's close friend, Arlene Cachu, looked thorugh the victim's apartment and informed the investigating officers that the only thing missing was her laptop. Schmid reviewed photo line-ups and identified Bonfiglio as the front seat passenger in Samayoa's car. She also identified appellants Martinez and Tiscareno as the other two men she saw with Samayoa that morning. Ingram identified Bonfiglio as the man she saw walking with Samayoa.

Bonfiglio was arrested on February 9, 2009. Tiscareno was arrested on February 11. Officers found Samayoa's laptop computer sitting on the bed in his apartment. In addition, Tiscareno had an encoder, a credit card reader, narcotics paraphernalia and a debit card in Martinez's name. Martinez was arrested about a week later.

Two days after Martinez's arrest, a long time acquaintance of both Martinez and Tiscareno, Charles Isaac, told investigating officers that Martinez had buried a gun in Isaac's backyard. Police located the gun and determined that it was the murder weapon. Prior to his arrest, Isaac lived at his parents' house in Whittier. Isaac told the detectives that both Bonfiglio and Martinez were at his house the night before the murder, trying to convince a third friend, Raphael Solorzano, to do something with them. Solorzano wanted no part of the plan and walked away. Tiscareno, who was also at the house, agreed to go with Bonfiglio and Martinez. Isaac did not hear them planning a robbery. He believed Tiscareno needed a ride to get his car out of an impound lot. The next day, Tiscareno complained to Isaac that the others took him "on a little fuckin rodeo." He was angry with Martinez about what had happened, although he never discussed the details with Isaac.

Isaac testified at trial that everything he told the police about Bonfiglio, Martinez and Tiscareno had been a lie. Another person, Tony G, asked to bury the

4

gun at Isaac's house.  Isaac explained that he was high on methamphetamine when he spoke to the officers.  He wanted their help to get released because his mother was in the hospital.  He wanted to be released so he could visit her, and also because he was the primary caregiver for his father.  Isaac's mother died while he was still in custody. Isaac testified he had been sober for four years by the time he testified.  He resented having to miss work to attend the trial.  He also resented that the officers did not help him get out of jail before his mother's death.

*Substantial Evidence Supports the Finding*

*Appellant Tiscareno Committed Robbery and Robbery-Felony Murder*

Tiscareno contends his convictions of robbery and felony murder are not supported by substantial evidence that he harbored the intent necessary to commit either crime.  He argues instead that the evidence establishes only his presence at the crime scene, not his intent to rob Samayoa.

As in every sufficiency-of-the-evidence case, we are required to review " 'the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128 . . . .)"  (*People v. Tafoya* (2007) 42 Cal.4th 147, 170 .)  The question is " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [ Citations.]'  (*People v. Earp* (1999) 20 Cal.4th 826, 887 . . . .)"  (*People v. Farnam* (2002) 28 Cal.4th 107, 142.)  We "presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. . . .  The test is whether substantial evidence supports the decision, not whether the evidence proves guilt beyond a reasonable doubt. [ Citations.]"  (*People v. Mincey*  (1992) 2 Cal.4th 408, 432.)  We may not re-weigh the evidence or second-guess credibility determinations made by the jury. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  "Simply put, if the circumstances

5

reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Farnam, supra*, 28 Cal.4th at p. 143.)

The jury found appellant Tiscareno guilty of robbery-felony-murder. Substantial evidence supports the factual findings that Samayoa was robbed of her laptop computer and that Tiscareno participated in the robbery.  Samayoa told her best friend, Cachu, that Bonfiglio wanted a laptop computer, but she was not going to give it to him.  According to Cachu, the only property missing from Samayoa's apartment was her laptop.  The day before her murder, Bonfiglio and Martinez were pounding on her front door.  They told a neighbor to tell Samayoa that Bonfiglio was looking for her.  Later that day, Bonfiglio and Martinez were at Isaac's house trying to convince a third person to join them in a plan they did not explain to Isaac.  It is reasonable to infer the plan was one to rob Samayoa of her laptop.  When that person declined to participate, Tiscareno volunteered.  Schmid identified Tiscareno as one of the three men she saw with Samayoa just minutes before the murder.  At the time of his arrest, Tiscareno was in possession of the stolen laptop and of other items used to commit identity theft.  His nickname, "Goofy," was a recognized user name on the computer. "Goofy" had last logged onto the computer on the day of Tiscareno's arrest. Photographs of Tiscareno were downloaded to the computer that same day.

Tiscareno's possession of the stolen computer is substantial evidence that he participated in the robbery of Samayoa.  "It has been stated that ' "when a person is shown to be in possession of recently stolen property slight corroborative evidence of other inculpatory circumstances which tend to show guilt supports the conviction of robbery." ' (*People v. Mulqueen* (1970) 9 Cal.App.3d 532, 542 . . . .)"  (*People v. Hughes* (2002) 27 Cal.4th 287, 357.)  Here, the "other inculpatory circumstances," include Isaac's statement placing Tiscareno with Bonfiglio and Martinez on the day before the murder, and Schmid's testimony identifying Tiscareno as one of the three men walking with Samayoa only a few minutes before her death.

6

There is also substantial evidence that Samayoa was murdered during the course of the robbery. She told her close friend that Bonfiglio wanted a laptop from her and that she was not going to give it to him. The only property missing from Samayoa's apartment was her laptop, which was later recovered from Tiscareno's apartment. "We have stated that 'when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of the robbery.' " (*People v. Hughes, supra,* 27 Cal.4th at p. 357, quoting *People v. Turner* (1990) 50 Cal.3d 668, 688.)

*Substantial Evidence Supports the Special Circumstance Finding*
*That Appellant Martinez Committed Murder During a Robbery*

With respect to appellant Martinez, the jury found that Samayoa was killed during the commission of a robbery in which a principal was armed with a firearm. It further found appellant Martinez guilty of being a felon in possession of a firearm. (§ 29800, subd. (a), former § 12021, subd. (a).) However, the jury found the murder was not willful, deliberate and premeditated. It also found not true sentence enhancement allegations that appellant personally discharged a firearm, proximately causing Samayoa's death. (§ 12022.53, subd. (b), (c), (d).) Referencing these findings, appellant Martinez contends the evidence "fails to inspire constitutional confidence in the jury's special circumstance finding that [he] aided and abetted in a robbery *with the specific intent* that Samayoa be killed." We disagree. The jury was instructed that it could find the robbery- felony murder special circumstance to be true if it unanimously found either that Martinez personally killed Samayoa or that he aided and abetted a robbery with the specific intent that she be killed. The record here contains substantial evidence to support either finding.

The trial court instructed the jury to "determine if the following special circumstance: is true or not true: that the Murder was committed while the defendant was engaged in, or was an accomplice in the commission of [or] attempted commission of the following felony: Robbery in violation of Penal Code section 211

7

or 211.5. [¶] . . . . [¶] Unless an intent to kill is an element of a special circumstance, if you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true. [¶] If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor or co-conspirator, you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree." (CALJIC No. 8.80.1.)

There is substantial evidence from which a reasonable jury could have found that Martinez actually murdered Samayoa by shooting her in the back of the head. The day before the shooting, Bonfiglio and Martinez went looking for Samayoa at her apartment. They later went to Isaac's house where they tried to convince Solarzano to help them rob Samayoa the next day. Eventually, Tiscareno agreed to go with Bonfiglio and Martinez. Schmid identified Martinez and Tiscareno as two of the men accompanying Samayoa to her car on the morning of the murder. A few minutes later, Schmid saw Martinez and Tiscareno sitting the back seat of Samayoa's car. During the next 10 to 15 minutes, Samayoa was shot in the back of the head. That night, Martinez returned to Isaac's to bury the murder weapon in Isaac's yard. A jury could reasonably conclude that Martinez fired the fatal shot himself.

Substantial evidence would also support a finding that Martinez intentionally aided and abetted Samayoa's killing. First, there is substantial evidence that the three men planned to rob Samayoa of her laptop computer and to kill her, eliminating the only witness to their robbery. Samayoa told Cachu that Bonfiglio wanted her to give him a computer that he could use to commit identity theft. She had decided not to comply. Bonfiglio and Martinez went to her apartment the day before the killing, looking for her. Then, they went to Isaac's, where they recruited Tiscareno

8

to join them.  One of the men brought a gun along when they returned to Samayoa's because the three men outnumbered and outweighed Samayoa; they could easily have overpowered her and taken the computer from her apartment.  Instead, they escorted her to her car, had her drive a short distance down an alleyway.  The men took Samayoa's computer and one of them shot her in the back of the head.  A jury could reasonably infer from these circumstances that the men planned to murder Samayoa to eliminate her as a witness to the robbery of her computer.

We are not required to presume the jury found Martinez was an aider and abettor, and not the shooter, based on its findings that the firearm use allegations were not true.  (*People v. Santamaria* (1994) 8 Cal.4th 903, 919.)  The jury is allowed to return inconsistent verdicts.  (*People v. Guzman* (2011) 210 Cal.App.4th 1090, 1095, fn. 3.)  " ' "It is . . .  settled that an inherently inconsistent verdict is allowed to stand; if an acquittal of one count is factually irreconcilable with a conviction on another, or if a not true finding of an enhancement allegation is inconsistent with a conviction of a substantive offense, effect is given to both."  '  (*People v. Panah* (2005) 35 Cal.4th 395, 490 . . . ; *People v. Avila* (2006) 38 Cal.4th 491, 600 . . . .)"  (*People v. Abilez* (2007) 41 Cal.4th 472, 512-513.)

*Instructions Regarding Aiding and Abetting*

The trial court instructed the jury in terms of the pattern instructions CALJIC No. 3.00, 3.01 and 3.02.  Thus, the jury was instructed:  "Persons who are involved in committing . . . a crime  are referred to as principals in that crime.  Each principal, regardless of the extent or manner of participation is equally guilty.  Principals include:  [¶]  1. Those who directly and actively commit . . . the act constituting the crime, or [¶]  2. Those who aid and abet the commission . . . of the crime."  (CALJIC No. 3.00.)  A person aids and abets a crime "when he or she :  [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and (2)  With the intent or purpose of committing or encouraging or facilitating the commission of the crime, and [¶]  (3) By act or advice, aids, promotes, encourages or instigates the commission

9

of the crime."  (CALJIC No. 3.01.)  The jury was further instructed, "One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted.  [¶]  In order to find the defendant guilty of the crimes of Murder, as charged in Count 1, you must be satisfied beyond a reasonable doubt that:  [¶]  1. The crime of Robbery was committed;  [¶]  2. That the defendant aided and abetted that crime; [¶]  3. That a co-principal in that crime committed the crime of Murder and 4. The crime of Murder was a natural and probable consequence of the commission of the crime of Robbery."  (CALJIC No. 3.02.)

Appellants contend the trial court erred because these instructions were conflicting, confusing and deprived each appellant of his due process right to have the jury determine his individual culpability.  More specifically, they contend the "equally guilty" language in CALJIC No. 3.0, combined with the "natural and probable consequences" language in CALJIC No. 3.2 allowed the jury to find each appellant guilty without determining their individual culpability.  There was no error.

First, the instructions at issue are accurate statements of law.  (*People v Canizalez* (2011) 197 Cal.App.4th 832, 849; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 11663.)  Neither appellant objected to the instructions or requested that they be modified in any way.  Consequently, appellants have forfeited appellate review of the claim that the instructions required clarification or amplification. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1037; *People v. Guivan* (1998) 18 Cal.4th 558, 570.)

Second, appellants have not established that their respective trial counsels' failure to object to the instructions constituted ineffective assistance of counsel.  The present record contains no evidence supporting the assertion that counsels' failure to object to these legally correct, pattern instructions caused their representation to fall below an objective standard of reasonableness.  (*People v.*

10

*Waidla* (2000) 22 Cal.4th 690, 743.)  Nor does this record contain any explanation of counsels' tactical decision to accept the instructions without objection.  (*People v. Avena*  (1996) 13 Cal.4th 394, 444.)

Finally, had the contention not been forfeited, we would reject it. Appellant Martinez relies on *People v. Samaniego, supra,* to contend the "equally guilty" language in CALJIC No. 3.0 permitted the jury to find him guilty of murder as an aider and abettor based on the direct perpetrator's mental state, rather than his own. But *Samaniego* found an earlier version of this instruction to be misleading because it did not explain that the guilt of an aider and abettor to murder " 'is determined by the combined acts of all the participants as well as that person's own *mens rea*[,]' " and that the aider and abettor may be guilty of a lesser offense than the perpetrator "if the perpetrator has a less culpable mental state."  (*People v. Samaniego, supra,* 172 Cal.App.4th at pp. 1164-1165.)  The instruction given in the instant case, however, contained both caveats.  It informed the jury, "When the crime charged is murder, the aider and abettor's guilt is determined  by the combined acts of all the participants as well as that persons own mental state.  . . .  [T]he aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state." (CALJIC No. 3.00.)

Martinez further complains the "natural and probable consequences" language in CALJIC No. 3.02 was unnecessary because the jury was instructed on the felony murder rule.  The jury was instructed that it could find appellants guilty of murder only if it found they killed Samayoa "with malice aforethought or during the commission or attempted commission of Robbery . . . ."  CALJIC No. 3.02 benefitted appellants because it required them to further find that the killing was a natural and probable consequence of the robbery.  The trial court's decision to give a superfluous instruction beneficial to appellants "does not provide [them] with a reason to complain on appeal."  (*People v. Dayan* (1995) 34 Cal.App.4th 707, 717.)

*Asserted Failure to Instruct With CALJIC 8.81.17*

11

Appellants contend there was substantial evidence from which the jury could have found the robbery of Samayoa's laptop was an afterthought, or incidental to her murder. As a consequence, they contend, the trial court erred when it failed to instruct the jury, in terms of CALJIC No. 8.81.17, that the special circumstance of murder committed during a robbery "is not established if the robbery was merely incidental to the commission of the murder." There was no error.

A trial court must "instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial." (*People v. Lopez* (1998) 19 Cal.4th 282, 287.) This duty arises where the trial record contains substantial evidence supporting application of the instruction. (*People v. Shockley* (2013) 58 Cal.4th 400, 403 [trial court has sua sponte duty to instruct on lesser offense if there "evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense."].)

No such substantial evidence exists here. Samayoa told her best friend that she was not going to give Bonfiglio the computer he wanted. The lap top Samayoa used to commit identity theft was the only item missing from her apartment after her death. It was later found in Tiscareno's apartment.

Moreover, the jury was instructed, "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of Robbery is murder of the first degree . . . ." (CALJIC No. 8.21) It was further instructed, "A defendant cannot be convicted of murder (Pen. Code, § 187) as an aider and abettor under the felony-murder doctrine if the robbery he was alleged to have aided and abetted occurred after the victim had been murdered." Similarly, the instructions it received regarding the robbery special circumstance required the jury to determine whether the murder "was committed while the defendant was engaged in, or was an accomplice in the commission of [or] attempted commission of the following felony: Robbery . . . ." The trial court had no obligation to repeat the point a fourth time by giving CALJIC

12

No. 8.81.17, especially where there was no substantial evidence the robbery was merely incidental to the murder. (See, e.g., *People v. Bacon* (2010) 50 Cal.4th 1082, 1112 ["the court need not give a pinpoint instruction that merely duplicates other instructions."]; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 220 [not necessary to repeat definitions of premeditation and deliberation which were already provided to jury through other instructions].)

*Conclusion*

The judgments are affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P.J.


PERREN, J.

13

Mark C. Kim, Judge

Superior Court County of Los Angeles

_____

Kathy Moreno, under appointment by the Court of Appeal, for Raul Tiscareno, Defendant and Appellant.

Edward H. Schulman, under appointment by the Court of Appeal, for Daniel Keith Martinez, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.